Maria Arlete VAZ BORRALHO, et al., Plaintiffs-Appellants,

v.

KEYDRIL COMPANY, Key International Drilling Company, Ltd. and Key Perfuracoes Maritimas, Ltda., Defendants-Appellees.

No. 81–2436
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 27, 1983.

Benton Musslewhite, Robert A. Chaffin, Houston, Tex., for plaintiffs-appellants.

Ted C. Litton, Houston, Tex., for defendants-appellees.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a judgment dismissing a wrongful death action brought by the appellants under the Jones Act, 46 U.S.C. § 688, and the general maritime law of the United States, and alternatively under the Death on High Seas Act, 46 U.S.C. § 761, and the Texas Wrongful Death Statute, Tex.Rev.Civ.Stat.Ann. art. 4671. Appellants are the survivors of a Brazilian seaman who died as a result of injuries sustained on board a submersible drilling rig, the KEY WEST, located off the Brazilian coast. The district court dismissed appellants' action against appellees on the ground of *forum non conveniens*. The primary question is whether the fact that American-based corporations owned the business entities which employed the decedent and owned the drilling rig upon which he was injured constitutes a substantial contact with the United States warranting the application of American law to appellants' lawsuit. We hold that, in the context of this case, the contacts with the United States are insubstantial when compared with those to Brazil, and that the district court, in dismissing appellants' action, did not abuse its discretion. However, because the order of dismissal was made unconditionally, we reverse and remand the case so that the district court may adequately protect the appellants' interests by fashioning an order of dismissal based upon appropriate conditions.

## I.

### FACTS

The KEY WEST was built in the United States in 1974. Ever since its construction, the KEY WEST has been stationed off the coast of Brazil, first at Belem and then, sometime after the incident in suit, at Fortaleza, drilling for petroleum products for the Brazilian national oil company, Petrobas, under a charter agreement between Petrobas and the owner of the KEY WEST,

appellee Key International Drilling Company, Ltd. ("KIDC"). KIDC is a Bermudian corporation whose shares are ultimately owned by Gulf Oil Corporation ("Gulf"). Although owned by a Bermudian corporation, the KEY WEST is registered in Liberia and flies the Liberian flag.

KIDC and appellee Keydril Company ("Keydril"), a Delaware corporation, whose shares are also owned by Gulf, owned appellee Key Perfuracoes Maritimas, Ltda. ("KPM"), a Brazilian limited liability business entity, which was formed at Petrobas's insistence and was under contract to it to drill for petroleum products, using the KEY WEST as the drilling rig. KIDC guaranteed KPM's performance under this contract.

On February 18, 1974, the decedent, Prisco Da Silva Borralho ("Borralho"), a resident and citizen of Brazil, entered into a contract with KPM in Belem, Brazil, which obligated him to work as its employee on board the KEY WEST. This contract, which was written in Portuguese, provided, among other things, that Belem would be the forum for "all questions derived or resulting from" the contract. On or about March 1, 1977, Borralho injured his leg on board the KEY WEST. He was taken ashore for treatment and died in a Brazilian hospital two days later from an embolism.

Appellants,[1] who are all Brazilian citizens and residents of Para, Brazil, filed suit against Keydril, KIDC, and KPM in the federal district court for the Southern District of Texas for damages arising out of Borralho's injuries and death under the Jones Act and the general maritime law of the United States, and alternatively under the Death on the High Seas Act and "the Wrongful Death Statutes of the State of Texas."[2] Appellants, however, asserted no claim under Brazilian law.

Appellees responded to appellants' complaint by interposing various defenses under Fed.R.Civ.P. 12(b)[3] in their answers, and afterwards, together they filed a motion to dismiss the complaint based on the doctrine of *forum non conveniens.* In support of their motion, appellees filed the affidavit of Virgil Stone, the President of Keydril and KIDC, whose deposition was later taken by appellants and filed with the district court.[4] Stone's testimony revealed that KPM was not qualified to do business in the United States; that neither KPM nor KIDC derived any income from operations conducted in the United States; and that KPM had "shoreside managerial people" in Brazil "who direct[ed] the operation of" the KEY WEST.[5]

After considering the choice of law factors of *Lauritzen v. Larsen,* 345 U.S. 571, 73

1. The appellants are Maria Arlete Vaz Borralho, the widow of decedent, individually and as personal representative of the estate of said decedent, and the children of the decedent: Maria de Lourdes Vaz Borralho, Maria Garciete Vaz Borralho and Maria Nelsonita Vaz Borralho.

2. The appellants' complaint alleges that the damage to the Borralho family is comprised of (1) loss of financial support, (2) loss of love, care, consortium, society, affection, attention, companionship, comfort, protection, and personal guidance, and the loss of monetary value of Borralho's household and domestic services. The complaint also seeks recovery for pain and suffering Borralho endured before his death. The complaint makes no wage claim under 46 U.S.C. § 596. *See Abraham v. Universal Glow, Inc.,* 681 F.2d 451 (5th Cir.1982).

3. Each defendant attacked the jurisdiction of the court, the venue of the court, and the alleged failure of the complaint to state a claim.

4. Although appellants rely heavily on Mr. Stone's testimony, they did not have his deposition included as part of the record on appeal. Portions of the deposition are quoted, and not disputed, in the papers included in the record. The absence of Mr. Stone's entire deposition is not, however, harmful to appellants' argument since, for the purpose of this opinion, we will assume that the ultimate ownership of the KEY WEST is American and that its base of operations, and those of the relevant business entities, were in the United States. *See Chiazor v. Transworld Drilling Company, Ltd.,* 648 F.2d 1015, 1018 n. 4 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

5. Appellants contested the motion to dismiss, by relying on the deposition testimony of Mr. Stone and on the affidavit of an "investment advisor," who opined (after reviewing Mr. Stone's testimony) that an independent business relationship did not exist among appellees.

S.Ct. 921, 97 L.Ed. 1254 (1952) and *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the district court decided that American law did not apply to the appellants' lawsuit. The court then considered the *forum non conveniens* factors of *Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 506–507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947), and dismissed the case without prejudice. The order of dismissal was made unconditionally.

## II.

### STANDARD OF REVIEW

■ Before a district court dismisses a case based on the doctrine of *forum non conveniens,* it should first ascertain whether American or foreign law governs the lawsuit.[6] If American law applies, then the district court should normally retain jurisdiction and proceed with the case. If, however, foreign law does apply and the foreign forum is accessible, then the district court should determine in which forum the case should be tried, and if it decides that the lawsuit should be tried in the foreign forum, then the court should decline to exercise jurisdiction over the case. *Fisher v. Agios Nicolaos V,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied, sub nom, Valmas Brothers Shipping, S.A. v. Fisher,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981).

■ While the choice of law determination is generally subject to our *de novo* review, *Phillips v. Amoco Trinidad Oil Company,* 632 F.2d 82, 84 (9th Cir.1980), *cert. denied, sub nom, Romilly v. Amoco Trinidad Oil Company,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), "the *forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper*

---

6. The choice of law analysis for suits brought under the Jones Act and those brought under the general maritime law of the United States is the same. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Our decisions have likewise applied the same choice of law principles to claims under the Death on the High Seas Act, which provides for an action "in admiralty." *See Symonette Shipyards, Ltd. v. Clark,* 365 F.2d 464, 466–467 (5th Cir.1966), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967); *Chiazor v. Transworld Drilling Company, Ltd.,* 648 F.2d 1015, 1016–1017, 1020 n. 7 (5th Cir.1981), *cert. denied,* 102 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *see also De Mateos v. Texaco, Inc.,* 562 F.2d 895 at 900 (3d Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978).

Under the Texas Wrongful Death Statutes, Tex.Rev.Civ.Stat.Ann. arts. 4671, 4678, before 1975 the substantive law applicable to an action for wrongful death, where the death occurred outside of Texas, was the law of the foreign state or country where the wrongful death occurred, *i.e.,* the *lex loci delicti. Gutierrez v. Collins,* 583 S.W.2d 312, 315 (Tex.1979); *Cox v. McDonnell-Douglas Corp.,* 665 F.2d 566, 569–570 (5th Cir.1982). In 1975, however, Article 4671 was amended to apply to wrongful deaths "occurring either within or without this State." Although we have found no decisions construing the effect of this amendment on the choice of law rule to be applied where the wrongful death occurs outside of Texas, the Supreme Court of Texas in *Gutierrez* stated that the contemporaneous 1975 amendment to Article 4678 was "an obvious change from the *lex loci delicti* rule." *Gutierrez,* 583 S.W.2d at

317 n. 3. The most significant contacts test rather than the *lex loci delicti* rule may be applicable to wrongful death actions as it is in tort actions arising under the common law in Texas. *See Cox,* 665 F.2d at 569 n. 3. In any event, whichever one of these choice of law rules applies, it is clear that Texas courts would not apply Texas substantive law to the wrongful death claims before us. The same general choice of law principles clearly apply to actions under the Texas survival statute. Tex.Rev.Civ. Stat.Ann. art. 5525. Moreover, for deaths resulting from maritime torts seaward of state territorial waters, the Death on the High Seas Act likely preempts state *wrongful death* actions. *See Dore v. Link Belt Company,* 391 F.2d 671 (5th Cir.1968), *rev'd on other grounds, sub nom Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). *See also Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *Bodden v. American Offshore, Inc.,* 681 F.2d 319, 327 (5th Cir.1982); *Hamilton v. Canal Barge Company, Inc.,* 395 F.Supp. 978 at 983 n. 1 (E.D.La.1975). However, there is authority that state *survival* actions are not so preempted. *See, Dennis v. Central Gulf S.S. Corp.,* 453 F.2d 137 (5th Cir.1972); *Dugas v. National Aircraft Corp.,* 438 F.2d 1386 (3d Cir. 1971). *But see Hamilton, supra.* We need not directly address these matters, as plainly the Texas courts, even if they had the option to do so, would not apply Texas substantive law to this action (except perhaps to pure survivability *vel non,* as opposed to the elements of the cause of action itself and the damages recoverable if death had not occurred).

*Aircraft Company v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419, 436 (1981). We may reverse a district court's decision on a motion to dismiss based on *forum non conveniens* only if its action constitutes a clear abuse of discretion. *Chiazor v. Transworld Drilling Company, Ltd.,* 648 F.2d 1015, 1017–1018 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

> "[W]here by application of the *Lauritzen* factors the correct choice of law decision is to apply *foreign* law (and a foreign forum is accessible), a district court's discretion in granting a *forum non conveniens* dismissal will not ordinarily be disturbed on review." *Fisher,* 638 F.2d at 315.

## III.

### CHOICE OF LAW

Appellants' first contention is that there were disputed material issues of fact respecting the choice of law determination that should have been reserved for trial on the merits and referred to a jury for determination and not decided by the district court.[7] They argue that under Fed.R.Civ.P. 12(b)(6), the appellees' motion to dismiss must be treated as a motion for summary judgment under Fed.R.Civ.P. 56, and as such, all factual questions must be resolved in their favor.

■ An objection based on the doctrine of *forum non conveniens* is not governed by Rule 12. The objection is not based on improper venue, which must be asserted by preliminary motion or answer. "The doctrine does not come into play unless the court in which the action is brought has

both subject matter and personal jurisdiction and is proper venue." 12 Wright & Miller, *Federal Practice & Procedure: Civil,* § 3288; *Gulf,* 330 U.S. at 507, 67 S.Ct. at 842. As stated by the Third Circuit in *Dahl v. United Technologies Corp.,* 632 F.2d 1027, 1029 (3d Cir.1980):

> "The principle of *forum non conveniens* permits a court to decline jurisdiction even though venue and jurisdiction are proper, on the theory that for the convenience of the litigants and the witnesses, the action should be tried in another judicial forum."

The question raised by appellants' contention concerns the manner in which the factual issues raised in connection with *forum non conveniens* are resolved. For the reasons below, we think that the answer to this question is found in the cases which deal with motions to transfer under 28 U.S.C. § 1404(a).

■ In 1948, § 1404(a) became effective. It was drafted in accordance with the doctrine of *forum non conveniens,* permitting transfer to a more convenient federal forum, even though venue was proper. The statute "has, in effect, codified and replaced this doctrine whenever the more convenient tribunal is the United States District Court where the action 'might have been brought.'" *Vanity Fair Mills, Inc. v. T. Eaton Company,* 234 F.2d 633, 645 (2d Cir.); *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); 15 *Wright, Miller & Cooper,* § 3841. Since the doctrine of *forum non conveniens* has been incorporated into § 1404(a), the decisions respecting the procedure and mode of resolving the issues raised in connection with motions to transfer and motions to dismiss based on *forum*

---

7. In their brief, appellants assert that the following facts are in dispute: (1) the location of the base of operations for the KEY WEST; (2) the location of the base of operations for KIDC; (3) whether the Liberian flag flown by the KEY WEST was one of convenience; (4) whether the alter ego doctrine applied to KPM in its relationship with KIDC and Keydril; (5) whether those who controlled the KEY WEST were in turn controlled by American based or owned corporations; and (6) whether Borralho, at the time of his accident, was controlled by persons

on the payroll of, and controlled by American based or owned corporations. Alternatively, appellants argue that as a matter of law, KPM was the alter ego of KIDC and Keydril, and the latter two were alter egos of each other, and that *accordingly:* the KEY WEST was operated by KIDC and Keydril, KIDC was Borralho's true employer, and the base of operations for Keydril, KIDC, KPM, and the KEY WEST is Houston, Texas. A demand for a jury trial was made by appellants in their original complaint.

*non conveniens* are similar. Both motions may be made either before, as well as after, an answer is filed. *Spencer v. Alcoa Steamship Co.,* 221 F.Supp. 343, 344 (E.D.N. Y.), *aff'd,* 324 F.2d 957 (2d Cir.1963); *Snam Progetti S.P.A. v. Lauro Lines,* 387 F.Supp. 322 (S.D.N.Y.1974); 1 Moore ¶ 0.145[4.–3]. In determining such motions, the district court may consider affidavits submitted by both parties, interrogatories, and depositions. *Vanity Fair,* 234 F.2d at 645; *Dahl v. United Technologies Corp.,* 472 F.Supp. 696, 698 n. 6 (D.Del.1979), *aff'd,* 632 F.2d 1027 (3d Cir.1980); *Starnes v. McGuire,* 168 U.S.App.D.C. 4, 512 F.2d 918, 933–934 (1974); *Plum Tree, Inc. v. Stockment,* 488 F.2d 754 (3d Cir.1973).

In *Castanho v. Jackson Marine, Inc.,* 650 F.2d 546, 550 (5th Cir.1981), this Court adopted the standard used for the consideration of a petition for mandamus, sought in the context of a district court's decision on a § 1404(a) motion to transfer, to pass on a petition for mandamus seeking to direct the district court to dismiss the action on the basis of *forum non conveniens,* viz:

"The question of *forum non conveniens* arises in this case in the form of a motion to dismiss rather than a motion to transfer under section 1404(a) only because the alternative forum is a foreign nation and thus no transfer is possible.... We perceive no reason why a petition for a writ of mandamus aimed at the district court's decision on the applicability of *forum non conveniens* should be treated any differently when based on a motion to dismiss than when based on a motion to transfer, and we therefore turn to the standard applied to petitions involving district court decisions on section 1404(a) transfer motions."

Because we have been unable to find any *forum non conveniens* decisions dealing with the precise issue before us, that is, whether the resolution of factual issues raised in connection with a choice of law determination (in the context of a motion to dismiss based on *forum non conveniens*) must be made by a jury, where one is demanded, we also turn to a case involving § 1404(a), which has considered this issue.

In *Chance v. E.I. Dupont Nemours & Company, Inc.,* 57 F.R.D. 165 (E.D.N.Y. 1972), defendants moved for a transfer under § 1404(a). The issue was whether a jury trial was required to decide issues of fact raised in connection with the choice of law determination, upon which the district court's decision on the motion to transfer depended. The district court began its analysis by noting that "constitutional guarantees of a jury trial in actions at law in federal courts do not mandate a jury determination of every issue of fact." 57 F.R.D. at 169. The court then held that the resolution of the factual issues respecting the choice of law determination was for the court, and not a jury:

"The nature of the inquiry which must be undertaken to resolve choice of law questions renders its determination by the jury unworkable in many instances. While under the old hard and fast choice of law rules the jury was probably as capable as the court of resolving the issue, adoption of the modern significant relationship test makes jury determination of all of the factors bearing upon choice of law impossible and its resolution of factual issues upon which some factors hinge a cumbersome, delay-ridden, and potentially confusing and time-wasting process.

" . . .

"Since the jury will still determine the ultimate facts on the merits, preliminary judicial resolution of the factual issues relevant to the choice of law does not impinge upon the right to jury trial. To extend jury trial to the choice of law issues would result in delay and confusion and thereby impairing the right to jury trial on the merits—the overwhelming objective of the Seventh Amendment." 57 F.R.D. at 170–171.

We agree with the reasoning of the district court, and believe it is applicable here. We hold therefore, that under the circumstances of this case, the choice of law issues, on the resolution of which the court's decision on the *forum non conveniens* issue

was largely dependent, were properly determined by the district court.

Appellants made no assertion in their pleadings or argument to the district court that the choice of law issues and the merits of their case were "factually meshed" so that a hearing or ruling thereon would have disposed of the merits of their cause of action, and therefore should have been deferred until a trial on the merits.[8] Nor did they ask the district court to receive (or offer to present) "live" testimony respecting the choice of law issues in dispute or ask for additional time to conduct further discovery on these issues. *See* 5 *Moore's Federal Practice* ¶ 38.36[3]; *Dahl,* 472 F.Supp. 696, 698 n. 6 (D.Del.1979), *aff'd,* 632 F.2d 1027 (3d Cir.1980). And finally, appellants made no request or objection in the district court asserting that resolution of the disputed choice of law factors should be made by the jury. Under the circumstances, we cannot say that the district court abused its discretion in the manner it chose to dispose of appellees' motion to dismiss. It is the general rule that such motions should ordinarily be made and determined before trial on the merits. We see no reason to depart from that general rule here.

█ In reaching its decision to grant appellees' motion to dismiss, the district court considered the affidavits submitted by both parties, the deposition testimony of Mr. Stone, the pleadings, and the arguments of counsel. In its written Memorandum and Order, the court found: (1) that the alleged wrongful act occurred on the Continental Shelf of Brazil; (2) that the decedent and the appellants were citizens of Brazil; (3) that the decedent's employment contract was made in Brazil; (4) that KIDC, the owner of the KEY WEST, was a Bermuda corporation; (5) that the KEY WEST was registered in Liberia; (6) that the KEY WEST "was under charter to Petrobas, the national oil company of Brazil and was engaged in the exploration for oil off the coast of Brazil"; (7) that the KEY WEST was delivered to Brazil in 1974, and has remained "anchored" off that country's coast exploring for natural resources since that time; (8) "that KPM was created at the insistence of the Brazilian government in order that a Brazilian corporation would be responsible for the drilling operations off of that country's coast"; (9) that "the tort arises out of a foreign state's efforts to develop natural resources off its coast"; (10) that the base of operations for the KEY WEST is in Brazil; and (11) that KPM is a separate corporate entity.

Appellants do not dispute any of the first eight findings made by the district court, though they claim Liberian registration was "for convenience only." Nor do they challenge the undisputed facts that each plaintiff is, and decedent was, a Brazilian resident, and that decedent's employment contract, written in Portuguese and providing for dispute resolution in Brazil, was with KPM, a Brazilian entity. Appellants do challenge the last two findings of the district court. The basis for this challenge is essentially the assertion that KPM was controlled by, and was the alter ego of or agent for, Keydril, and that KIDC and Keydril were alter egos of each other, and each has and had its base of operations in the United States. Appellants do not question that KPM existed under Brazilian law as a separate legal entity or that it was formed at the insistence of the Brazilian government so that a Brazilian corporation would be responsible for the drilling operations. Nor do they contend that either the decedent or Petrobas believed the decedent was employed by anyone other than KPM or that the KEY WEST was not registered in Liberia or owned by a Bermudian corporation, or that Petrobas did not know with whom it was contracting. And appellants do not dispute the fixed location and long term nature of the KEY WEST's Brazilian sta-

---

**8.** In *Chance,* the court states that "[t]he circumstance that the facts found for the purpose of ruling on applicable law are intertwined with the ultimate issue on the merits does not require their resolution by the jury." 57 F.R.D. at 169. *But see Marra v. Bushee,* 447 F.2d 1282, 1285 (2d Cir.1971); *Orr v. Sasseman,* 239 F.2d 182, 186 (5th Cir.1956); 5 Moore's, ¶ 38.-36[3].

tioning, or that decisions as to day-to-day operations of the KEY WEST during this period were made in Brazil.

Even if the choice of law determination is "in the nature of a decision on a motion for summary judgment," *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980), as appellants contend, and even if we assume that the KEY WEST and all the relevant entities were alter egos of and controlled by American companies and had an American base of operations, and that Borralho was hence ultimately the employee of KIDC and Keydril, our decision in *Chiazor* and our affirmance of the district courts in *Martyn v. Transworld Drilling Company, Ltd.*, No. 78–3423 (E.D. Louisiana, November 20, 1979), *aff'd* 619 F.2d 82 (5th Cir.1980) and *Zekic v. Reading and Bates Drilling Company*, 680 F.2d 1107 (5th Cir.1982), plainly support the district court's determination that American law did not apply to appellants' lawsuit.

In *Chiazor*, a Nigerian seaman was injured while working as a mud engineer on a submersible drilling rig which had been stationed off the coast of Nigeria for several years. The rig was owned by a Nigerian corporation, which, in turn, was wholly owned by an American corporation. For the purposes of its decision, this Court assumed that the American corporation was the owner of the rig and that its base of operations was in the United States. The Court then held:

"[E]ven assuming a U.S. base of operations, the substantiality of the contacts herein with Nigeria warrants the non-application of American law. We are unable to state, and [*Hellenic Lines Limited v.*] *Rhoditis* [398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252] in fact does not command us to hold, that the shipowner's base of operations is the sole controlling factor in a choice of law decision. *Hellinic Lines, Ltd. v. Rhoditis,* 398 U.S. at 308, 90 S.Ct. at 1734 (1974). Hence while certain of the eight (*Lauritzen* and *Rhoditis*) factors may be substantial in one context, they may be of lesser importance in another. Thus, in *Rhoditis*, in which the

court was concerned with a true maritime vessel, one plying the seas as an integral part of the shipping industry, the shipowner's base of operations was considered one substantial factor, *inter alia.*

"*However, we are faced with a 'vessel' (a submersible drilling rig) that has been permanently stationed off the coast of Nigeria since 1964.... Hence, such factors as place of wrongful act, allegiance or domicile of the injured, and place of contract, which may be less substantial in the shipping context, tend to take on added significance under the present circumstances.*

"When viewed in this light, it cannot be said that the district court erred in finding that there were substantial contacts with Nigeria, rather than the United States. The decedent was a Nigerian citizen, he was employed by a Nigerian corporation, the accident occurred off the coast of Nigeria, the 'vessel' has been stationed off Nigeria since 1964, and the plaintiffs are all Nigerian citizens. As in *Lauritzen, supra,* the overwhelming preponderance of the factors favor the application of Nigerian rather than American law as governing the employment and accident in question.

"The American-owned Nigerian subsidiary conducting the enterprise might possibly be said to have a base of operations in America, it is true, but, unlike *Rhoditis, supra,* the totality of circumstances of the case indicate this to be a minor weight in the scales." *Chiazor,* 648 F.2d 1018–1019 (emphasis added).

*See also Phillips v. Amoco Trinidad Oil Company,* 632 F.2d at 87.

In *Martyn,* the seaman, a citizen of Ireland, was injured on a drilling rig in the North Sea. Both his employer and the owner of the drilling rig were subsidiaries of an American-based corporation. These were the only contacts with the United States, and the district court held that they were insufficient to warrant application of American law. In *Zekic,* the seaman was a citizen of Yugoslavia employed by an American corporation to work on an offshore

drilling rig owned by an affiliated American corporation and located in Italian territorial waters. The district court held that American law did not apply and dismissed the seaman's action. 536 F.Supp. 23. This Court affirmed the dismissals in both cases.

Here, it is undisputed that Borralho's injury was sustained off the coast of Brazil; that ever since 1974, when it first became operational, the KEY WEST had been continuously stationed off the coast of Brazil drilling for petroleum products exclusively for, and pursuant to contract with, Petrobas, the Brazilian national oil company; that Borralho was a resident and citizen of Brazil during the time he worked on the KEY WEST; that KPM is a Brazilian business entity; that Borralho made his employment contract with KPM in Brazil; that this contract, written in Portuguese, provided all disputes arising therefrom were to be resolved in the forum of Belem, Brazil; and that Borralho's survivors, the appellants, are citizens and residents of Brazil. Although the base of operations for the KEY WEST may have been in the United States and the primary or long term decisions made there (and we so presume for purposes of the appeal), the record shows that *day-to-day operating* decisions and activities for the KEY WEST were made and conducted in Brazil. Additionally, as in *Chiazor,* and *Zekic,* there was nothing to suggest to the district court that any obligations of Keydril or KIDC were being evaded by the use of KPM to operate the rig. *Chiazor,* 648 F.2d at 1019. In fact, it is undisputed that Petrobas required KIDC (and Keydril) to form KPM, as a Brazilian entity, to perform the drilling as a condition to chartering the KEY WEST from KIDC.

█ Appellants argue that American ownership and control of the KEY WEST and KPM is sufficient by itself to constitute a substantial contact with the United States warranting the application of American law. Appellants rely on three Second Circuit decisions: *Bartholomew v. Universe Tank Ships, Inc.,* 263 F.2d 437 (2d Cir.), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959); *Antypas v. Cia Marti-*

*ma San Basilio, SA,* 541 F.2d 307, 310 (2d Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); and *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470 (2d Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974). Other circuits have declined to follow this approach. *See DeMateos v. Texaco, Inc.,* 562 F.2d 895, 902 n. 3 (3d Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978). Besides being made in cases factually distinguishable from that at bar, the Second Circuit's assertion that American ownership and control alone suffices to warrant the application of American law has been rejected by this Court in *Chiazor,* at least insofar as it concerns offshore drilling platforms at long term fixed locations. *See also Anastasiadis v. SS Little John,* 346 F.2d 281, 284 (5th Cir.1965), *cert. denied,* 384 U.S. 920, 86 S.Ct. 1368, 16 L.Ed.2d 440 (1966); *Zekic.* The Ninth Circuit's decision in *Phillips v. Amoco Trinidad Oil Company, supra,* is to the same effect as our *Chiazor* and *Zekic* holdings.

█ Appellants' next argument is that the district court erroneously used a balancing test instead of a substantiality test to make its choice of law determination. In *Rhoditis,* the United States Supreme Court adopted the rule announced in *Bartholomew* for making the choice of law determination:

"The decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transactions involved in the case and the United States, and then deciding whether or not they are substantial. Thus each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality. Moreover, each factor, or contact, or groups of facts must be tested in the light of the underlying objective, which is to effectuate the

liberal purposes of the Jones Act." *Rhoditis,* 398 U.S. at 309 n. 4, 90 S.Ct. at 1734 n. 4, 26 L.Ed.2d at 256 n. 4, quoting *Bartholomew,* 263 F.2d at 441; *see also Fisher v. Agios Nicolaos V,* 628 F.2d at 315.

In the instant case, the district court recited the choice of law factors of *Lauritzen* and *Rhoditis,* and then held that:

"Superimposed upon the facts of this case, the factors quantitatively and *qualitatively* demonstrate that the United States law should not control...." (emphasis added).

This language shows that the district court gave consideration not only to the number of contacts present, but to their substantiality as well. Moreover, as the Ninth Circuit said in *Phillips,* "Substantiality is a relative term, and *Lauritzen* requires that we compare the substantiality of our interest in a given transaction with that of other nations." *Id.,* 632 F.2d at 86. To the same effect is *Chirinos de Alvarez v. Creole Petroleum Corporation,* 613 F.2d at 1246, 1247 ("... the Venezuelan concerns are considerable; the United States interests pale in comparison.").

 Appellants' final choice of law contentions are that the district court's distinction between drilling rigs and blue water vessels violates the Jones Act, the Fourteenth Amendment to the United States Constitution, and existing case law by discriminating against the owners of blue water vessels. Appellants also assert that treating the nationality and residence of seamen as a potentially decisive element in the choice of law determination violates the equal protection clause of the Four-

teenth Amendment. Both contentions are entirely without merit. Appellants plainly have no standing to assert that the court's distinction between drilling rigs and seagoing vessels discriminates against the owners of the seagoing vessels. Such distinction already has been drawn by this Court in *Chiazor,* 648 F.2d at 1019, and by the Ninth Circuit in *Phillips,* 632 F.2d at 86, 87, and similar distinctions have been made in other maritime contexts. *See Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). As to the distinction between foreign and resident plaintiffs for choice of law purposes, this distinction is fully justified, as recognized by the Supreme Court in *Piper* and *Lauritzen. See also Symonette Shipyards, Ltd., supra,* 365 F.2d at 467; *Phillips, supra,* 632 F.2d at 88, 89. The Constitution does not require the United States, as a condition of applying its laws to its own citizens and residents, to be courthouse or law maker for the world.[9]

## IV.

### FORUM NON CONVENIENS

 Because the appellants asserted claims under American law only, once the district court determined that American law did not apply, "it could have properly dismissed the case pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and, if deposition and affidavits were considered [as they were in this case] have granted a summary judgment under

---

9. *Of course, the Fourteenth Amendment applies only to the states, not to the federal government. Nonetheless, the Fifth Amendment's due process clause has long been construed to include an equal protection guaranty generally as broad as that of the Fourteenth Amendment. See, e.g., Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). *Cf. Hampton v. Mow Sun Wong,* 426 U.S. 88 at 100, 96 S.Ct. 1895 at 1903, 48 L.Ed.2d 495 (1976) *(suggesting that in certain circumstances citizenship requirement might be justified in federal service although the identical requirement would be prohibited if im-*

*posed by a state). However, the equal protection clause, forbidding any state to "deny to any person* within its jurisdiction *the equal protection of the laws" (emphasis added), obviously does not forbid all distinctions, for purposes of determining whether American or foreign law applies, between resident or citizen plaintiffs and noncitizen plaintiffs who are not and never have been present in this country. Cf. Plyler v. Doe,* ─── U.S. ───, ─── ─ ───, 102 S.Ct. 2382 at 2391–2393, 72 L.Ed.2d 786 at 795–797 (1982) *(stressing geographical presence).*

Rule 56." [10] *Chiazor,* 648 F.2d at 1028 n. 7. *See also, Serrano v. Empresa Lineas Maritimas Argentinas,* 257 F.Supp. 870, 872 (D.C. Md.1966); Comment, *A New Look at Lauritzen v. Larsen, Choice of Law and Forum Non Conveniens,* 38 La.L.Rev. 957, 968–969 (1978). The district court, however, proceeded to dismiss the case under the doctrine of *forum non conveniens.* [11]

■ In their brief, appellants contend that appellees failed to discharge their burden to show that the Brazilian forum was accessible or that appellants had an adequate remedy under Brazilian law. Appellants make this assertion in connection with their argument respecting the choice of law determination. Although the accessibility of the foreign forum was discussed in *Lauritzen,* the court there stated that "this might be a persuasive argument for exercising a discretionary jurisdiction to adjudge a controversy, but it is not persuasive as to the law by which it shall be judged." Thus, the accessibility of the foreign forum pertains to the *forum non conveniens* determination rather than to choice of law. *Piper,* 454 U.S. at 254, 102 S.Ct. at 265, 70 L.Ed.2d at 435; *Samad v. Etivebank,* 134 F.Supp. 530, 536 (E.D.Va.1955).

In *Piper,* the Supreme Court stated:

"At the outset of any *forum non conveniens* inquiry, the [district] court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. *Gilbert, supra* [330 U.S. 501], at 506–507, 91 L.Ed. 1055, 67 S.Ct. 839 [842]. In rare circumstances, however, where

the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22, 70 L.Ed.2d at 435 n. 22.

The Court in *Piper* did, however, hold that under normal circumstances the possibility of an unfavorable change in the law should not be a relevant consideration in a *forum non conveniens* inquiry.

Appellants argued in the district court that appellees' motion was defective because it failed to show any other forum besides the United States where Keydril and KIDC would be amenable to service of process. Appellees, however, stipulated "that Keydril Company and Key International Drilling Company will appear in connection with any action instituted in Brazil arising from this incident. KPM, a Brazilian entity, of course, is susceptible to jurisdiction in Brazil and will likewise appear." On appeal, appellants reassert this argument and also argue, for the first time, that appellees failed to show that they had an adequate remedy under Brazilian law.

■ As to the accessibility of the Brazilian forum, appellees showed that Brazilian courts were open to appellants. Appellants are residents of Brazil, and appellees stipulated that they would appear in the Brazilian courts if the matter were pursued there.

---

10. As in *Chiazor,* appellants here do not contend that the district court should have retained jurisdiction if Brazilian law applied. Their sole argument here and in the lower court was that dismissal for *forum non conveniens* was inappropriate if American law applied. *Chiazor,* 648 F.2d at 1020 n. 8.

11. The district court stated:
 "Considering the *Gilbert* factors, the record clearly demonstrates the inappropriateness of this forum: (1) Brazilian law should apply; (2) the proof lies in Brazil; (3) compulsory process for Brazilian witnesses is unavailable

in the forum; (4) the cost of bringing Brazilian witnesses to Houston is very high; and (5) the 'Key West' could only be viewed in the coastal waters of Brazil. Therefore this court must conclude that Brazil offers the more appropriate forum."
These findings are not clearly erroneous, and indeed, except for the applicability of Brazilian law, are not challenged on appeal. While perhaps not *all* the proof lies in Brazil (*e.g.,* plaintiffs may have United States expert witnesses), certainly the trial court was justified in finding that by far the greater part of it lay there.

See Chiazor, 648 F.2d at 1020; *Schertenleib v. Traum,* 589 F.2d 1156, 1164 (2d Cir. 1978).[12] The contract between KPM and Borralho is also some evidence that the Brazilian courts are open to consider disputes arising out of an employer-employee relationship (and that they provide remedies to employees).

As to the substantive law of Brazil, we reject the notion that in the absence of a showing to the contrary, the presumption is that the substantive law of the foreign forum is inadequate. The presumption, instead, is that the substantive law of the foreign forum is adequate. *See Munich Reinsurance Company v. SS Eskisehir,* 1972

---

12. Although there is language in *Tivoli Realty v. Interstate Circuit,* 167 F.2d 155 (5th Cir.), *cert. denied,* 334 U.S. 837, 69 S.Ct. 1494, 92 L.Ed. 1762 (1948), which indicates that an agreement by the defendant to submit to the jurisdiction of a foreign forum is not sufficient to satisfy the requirement of two available forums, where the plaintiff could not have originally commenced his action in the foreign forum without the defendant's consent, we reject any such implication in cases of this kind, and hold that where American law does not apply an agreement by a defendant to submit to the jurisdiction of the foreign forum will satisfy the doctrine's requirement of "two forums in which the defendant is amenable to process." A defendant's agreement to submit to the jurisdiction of the foreign forum, along with a conditional dismissal, "obviates the need for extensive inquiry into foreign jurisdictional law since, if the foreign court refuses to take jurisdiction, 'plaintiff is still protected by the conditional nature of the dismissal.'" *Calavo Growers of Cal. v. Belgium,* 632 F.2d 963, 968 (2d Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). This is implicit in *Chiazor,* 648 F.2d at 1020. To the same effect is *In Re Disaster At Riyadh Airport Saudi Arabia,* 540 F.Supp. 1141, 1145 (D.D.C.1982).

In *Tivoli,* plaintiff filed suit against fourteen defendants in the federal district court of Delaware alleging a conspiracy in restraint of trade under the Sherman Antitrust Act and the Clayton Act. Before answering the Delaware action, two defendants filed suit in the federal district court for the northern district of Texas seeking to enjoin plaintiff from prosecuting the Delaware action. Seven more defendants intervened in the Texas action and joined in the prayer for an injunction. A temporary injunction hearing was held by the Texas court where the five remaining defendants, without intervening in the suit, filed a "paper" *denying* that the Texas court had jurisdiction over them, and voluntarily offering to submit to its venue if the Delaware complaint were brought in Texas. The Texas court granted a temporary injunction under the doctrine of *forum non conveniens.*

This Court reversed the district court in Texas, holding that it erred in granting the injunction. This Court noted that the five defendants had not intervened in the Texas action, and had failed to present the issue of inconvenience to the Delaware court. The Court also noted that

as between Texas and Delaware, the latter was in fact the more convenient and appropriate forum. 167 F.2d at 157. The Court also recognized that venue in the Delaware court "was laid pursuant to a special statute [15 U.S.C. § 22], and was the only forum where jurisdiction and venue could be obtained as to all of the several defendants." 167 F.2d at 156. The Court then made the following statement, apparently in response to the five defendants' offer to submit to the jurisdiction and venue of the Texas court:

"The doctrine of *forum non conveniens* furnishes the criteria for a choice between two or more forums in which the defendant is amenable to process. At least two such forums must be opened to the plaintiff before the doctrine comes into place; *and they shall not be dependent merely upon the will or grace of the defendant, but must be provided by law."* 167 F.2d at 156–157 (footnote omitted) (emphasis added).

In view of the peculiar circumstances of the *Tivoli* case, we think that the above quoted language was dicta. The defendants were not parties to the Texas action, and they sought relief based on *forum non conveniens* in the wrong court. And, as the opinion shows, venue was in any event properly laid in Delaware by special statute, and Delaware was in fact the more convenient forum. *See Farmanfarmaian v. Gulf Oil Corp.,* 437 F.Supp. 910, 917–918 (S.D.N.Y., 1977), *aff'd,* 588 F.2d 880 (2d Cir.1980) (distinguishing *Tivoli* on somewhat similar grounds).

Moreover, we also note that KIDC chartered the KEY WEST to Petrobas and guaranteed the KPM-Petrobas contract, and that appellants here have asserted that "KPM is the alter ego of [Keydril] and KIDC as a matter of law in light of the fact that KPM is merely the corporate tool of [Keydril] and KIDC in Brazil to deal with Petrobas" on their behalf. Assuming that this is so, then under American law, Keydril and KIDC would be amenable to process in Brazil. *See* 4 Wright & Miller, § 1069; *Product Promotion, Inc. v. Cousteau,* 495 F.2d 483, 492 (5th Cir.1974). Since appellees made no showing of what Brazilian jurisdictional law was, the court would have been entitled to presume that the jurisdictional law of Brazil was the same as that of the United States, and thus, Keydril and KIDC would have been amenable to process under appellants' theory of alter ego.

A.M.C. 2231 (S.D.N.Y.1972); *Anastasiadais*, 346 F.2d at 283 (in holding *forum non* dismissal proper we stated: "There has been no showing . . . that Greek laws would be unjust if applied and enforced."); *Chemical Carriers v. L. Smit & Company's Internationales*, 154 F.Supp. 886, 888–889 (S.D.N.Y. 1957).[13] This view is further supported by the reasoning of the Supreme Court in *Piper:*

"Except for the court below, every federal court of appeals that has considered this question after *Gilbert* has held that dismissal on grounds of *forum non conveniens* may be granted even though the law applicable in the alternate forum is less favorable to the plaintiff's chance of recovery . . . .

"If the possibility of a change in law were given substantial weight, deciding motions to dismiss on the ground of *forum non conveniens* would become quite difficult. Choice-of-law analysis would become extremely important, and the courts would frequently be required to interpret the law of foreign jurisdictions. First, the trial court would have to determine what law would apply if the case were tried in the chosen forum, and what law would apply if the case were tried in the alternative forum. It would then have to compare the rights, remedies, and procedures available under the law that would be applied in each forum. Dismissal would be appropriate only if the court

concluded that the law applied by the alternative forum is as favorable to the plaintiff as that of the chosen forum. *The doctrine of forum non conveniens, however, is designed in part to help courts avoid conducting complex exercises in comparative law.* As we stated in *Gilbert*, the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.' *Gilbert, supra* [330 U.S. 501], at 509, 91 L.Ed. 1055, 67 S.Ct. 839 [843]." 454 U.S. at 250–251, 102 S.Ct. at 262–263, 70 L.Ed.2d at 432–433. (emphasis added).

The Court, however, added:

"We do not hold that the possibility of an unfavorable change in law should *never* be a relevant consideration in a *forum non conveniens* inquiry. Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." 454 U.S. at 254, 102 S.Ct. at 265, 70 L.Ed.2d at 435.

It follows from this language that the district court may presume that the foreign law is adequate, unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum otherwise made known to the court, plainly demon-

---

**13.** Appellants' reliance on *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d at 468, is misplaced. There, plaintiffs, both American citizens, were injured on a vessel owned by Symonette, which was registered in, and flew the flag of, the Bahamas. Plaintiffs filed suit in the federal district court for the Southern District of Florida and recovered a judgment against Symonette, the district court applying American law, finding against Symonette on grounds of unseaworthiness, though without finding negligence, and proportionately reducing recovery because of the plaintiffs' negligence. On appeal, Symonette sought reversal on the basis that the law of the Bahamas, which it contended was applicable, required proof of negligence to establish unseaworthiness and disallowed all recovery in the event of contributory negligence. This Court, in rejecting Symonette's contention, noted that even if Bahamian law were held to govern, that the district court correctly applied American law since Symonette had failed to prove that the particular substantive doctrines on which it sought to rely were actually a part of the Bahamian law. Unlike the instant case, Symonette appears not to have sought a dismissal on the grounds of *forum non conveniens*. Thus, this Court in *Symonette* was not dealing with a *forum non conveniens* problem, but only with the particular substantive legal rules to be applied in the American forum. Under those circumstances, Symonette was obligated to prove the relevant principles of foreign law (that were different from American law) upon which it sought to rely. Here, if appellees had not filed a motion to dismiss based on *forum non conveniens*, but only sought to apply Brazilian law, then they would have had the burden to show what that law was. *See* Fed.R.Civ.P. 44.1.

strate that the plaintiffs are highly unlikely to obtain basic justice therein.[14]

■ In the instant case, appellants made no assertion in the district court that the substantive law of Brazil provided an inadequate remedy or that they could not expect to obtain justice in the Brazilian courts. Nor did the circumstances of the case give any such indication. In the absence of any such assertions or circumstances, we hold that the district court did not abuse its discretion in dismissing appellants' action under the doctrine of *forum non conveniens.*

## V.

### THE ORDER OF DISMISSAL

■ Although appellees have stipulated that they will submit to the jurisdiction of a Brazilian court, we feel that to properly protect the interests of appellants, the dismissal should be made conditional. We therefore reverse and remand the case so that the district court may fashion an order of dismissal based upon appropriate conditions. We suggest that consideration be given to conditioning the dismissal on the following: that appellees submit to service of process and jurisdiction in the appropriate Brazilian court in which plaintiffs shall have filed suit within 90 days of the order of dismissal; that appellees formally waive in the Brazilian proceeding any statute of limitations defense that has matured since the commencement of this action in the Southern District of Texas; that appellees formally agree in the Brazilian court to make available in Brazil all relevant witnesses and documents within their control and that any depositions, answers to interrogatories and the like filed herein may be used in the Brazilian proceeding to the same extent as if they had originated therein; that appellees formally agree in the Brazilian proceeding to satisfy any final judgment rendered by such court; and that

14. In *Menendez Rodriguez v. Pan American Life Ins. Co.,* 311 F.2d 429, 433 (5th Cir.1962), *vacated and remanded,* 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964), refugees from Cuba sued a Louisiana corporation in the United States district court to recover the cash surrender value of insurance policies confiscated by the communist government of Cuba in 1959. The district court dismissed the action under the doctrine of *forum non conveniens,* on the theory that the courts of Cuba were open as an alternative forum. This Court reversed, and after stating the test to be applied in determining whether to dismiss on the ground of *forum non conveniens,* the Court said:

"Defendant, under this test, must show that these plaintiffs, refugees from Castro's Cuba, can *obtain justice in the courts of Cuba.* The law does not impose upon these Cuban refugees, any more than any other plaintiff, the burden of proving that they would have problems of health or legal difficulties in obtaining justice in the courts of Cuba. By like token, we need not and do not embark upon an international sea of judicial notice of the treatment of those who flee their native land and return to Castro's jurisdiction to contest their property rights with a Louisiana corporation."

Although this language expresses a contrary view to our holding today, it was decided long before *Piper,* and given the unusual facts of the *Menendez Rodriguez* case, we feel that it is dicta and is not binding upon us. The plaintiffs there were *refugees who fled to the United States from the alleged alternate forum, a total-* itarian state. They were bona fide United States residents. It was a clear abuse of discretion for the district court to proceed upon the assumption that they could return to the country from which they had fled to litigate their claims there against the defense of confiscation by the government of the foreign forum. *See also Flota Maritima Browning De Cuba, Sociadad Anonima v. The Cuidad De La Habana,* 181 F.Supp. 301 (D.C.Md.1960). Since these facts were made known to the district court, the burden shifted to the defendant to show, if it could, that in spite of these conditions the Cuban courts were open to plaintiffs and that they had a reasonable chance to obtain justice therein. This they failed to do. Here, by contrast, there is no contention or indication that conditions in Brazil prevent the appellants, who reside there, from obtaining justice in its courts. The mere fact that the remedy there may not be as good as that afforded in the American forum or that their chances of recovery there are less favorable than here, is not conclusive. *See Piper,* 454 U.S. at 254, 102 S.Ct. at 265, 70 L.Ed.2d at 435; *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 453 (2d Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Chirinos de Alvarez v. Creole Petroleum Co. supra,* 613 F.2d at 1247; *Pain v. United Technologies Corp.,* 637 F.2d 775, 794 & n. 104 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

should appellees fail to promptly meet any of these conditions, the district court will resume jurisdiction over the case. The conditional order might also provide that it can be made final by appellees (1) if appellants do not file suit in the appropriate Brazilian court within 90 days after the order becomes effective or (2) if the case is timely filed, that appellees have complied with all of the conditions of the order and the appropriate Brazilian court has not finally declined jurisdiction. However, should the appropriate Brazilian court subsequently finally decline jurisdiction over the case, it may be reopened by plaintiffs in the district court, if it were timely filed in Brazil in accordance herewith, and limitations will not run during the period from the initial filing herein until 90 days after the Brazilian court's declining of jurisdiction. Notice of a motion to make the conditional order final, of course, should be given to appellants, and appellants given the opportunity to resist the motion on grounds of noncompliance only.[15]

The district court's judgment is therefore reversed and remanded.

REVERSED and REMANDED.

See also, 5th Cir., 575 F.2d 1140; 5th Cir., 590 F.2d 594.

---

**15.** We wish to emphasize that the order of dismissal need not contain all of the suggestions made above, nor is the district court precluded, upon further consideration, from adding other conditions or modifying those suggested here.