**GULF CONSOLIDATED SERVICES, INC., Plaintiff–Appellee,**

v.

**CORINTH PIPEWORKS, S.A., Defendant–Appellant.**

No. 89–2451.

United States Court of Appeals, Fifth Circuit.

April 26, 1990.

Joseph Newton, Eastham, Watson, Dale & Forney, Houston, Tex., for defendant-appellant.

Howard King, Funderburk & Funderburk, Houston, Tex., for plaintiff-appellee.

Before GEE, REAVLEY, and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

Today's case presents the question whether a Greek oil field casing manufacturer, licensed by a Texas-based organization which allows the manufacturer to warrant conformity with certain set standards, was properly haled into court in Texas to answer a claim that its products failed to conform to those standards. Because the manufacturer had an expectation that its products would be used in Texas, and having determined that its being required to defend suit in Texas was not unfair, we affirm the district court's exercise of personal jurisdiction.

## I. *Facts*

The nominal plaintiff-appellee, Gulf Consolidated Services, Inc., ("Gulf") is a Texas corporation with its principal office in Houston, Texas. Its insurer, the real party in interest who prosecuted this action, is American Motorists Insurance Company ("AMI"), an Illinois corporation with its principal place of business in Illinois. The defendant-appellant, Corinth Pipeworks, S.A., is a Greek corporation with its principal office in Athens, Greece.

In 1980 Gulf, under the name of International Materials & Services Co. ("IMS"), was engaged in the business of importing and selling pipe. In October of that year, IMS purchased 1,260 joints of steel oil field casing from Corinth. Corinth warranted that the casings were manufactured in accordance with American Petroleum Institute ("API") standards.

After the casings arrived in Houston, Texas, they were sent to a pipe threading company. Following threading, 66 joints of the casings were then sold by IMS to United Pipe & Supply ("United") in Midland, Texas. United subsequently sold the casings to one Wayman Buchanan. The 66 joints were sent to Mr. Buchanan's oil well, Neely No. 1, in Wheeler County, Texas.

During drilling operations on the well, the casing failed in seven separate locations, increasing the cost of the well by $433,587.81. Two unused joints of the 66 sent to the site were taken to Failure

Analysis Associates in Houston, where Metallurgical tests and examinations indicated that the two casings contained weld seam defects. These defects demonstrated that the casings inspected were not manufactured in accordance with API specifications. United reimbursed Mr. Buchanan for the additional drilling expenses incurred; and United was reimbursed, in turn, by AMI.

Following a bench trial, the district court found Corinth liable for breach of an express warranty that the casing would meet API specifications and for breach of the implied warranties of merchantability and fitness for a particular purpose. The court awarded actual damages of $433,587.88, prejudgment interest in the amount of $394,640.62, attorneys' fees in the amount of $55,050.18 and costs of $6,960.20.

## II. *Discussion*

### A. Jurisdiction

Corinth does not challenge its amenability to suit under the Texas Long–Arm Statute, but contends that it lacked sufficient contacts with Texas for it to be subject to the personal jurisdiction of the district court.

To satisfy the demands of due process, two requirements must be met before a non-resident defendant can be amenable to suit in a given forum. First, "(a) the nonresident must have some minimum contacts with the forum resulting from an affirmative act or acts on their part;" second, "(b) it must not be unfair or unreasonable to require the nonresidents to defend the suit in the forum state." *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1148 (5th Cir.1985).

### 1. Minimum Contacts

"[T]he concept of minimum contacts permits a non-resident to 'structure his primary conduct as to avoid being haled into court in a particular state.'" *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1169 (5th Cir.1985). Corinth alleges that it had purposefully structured its conduct so as to avoid being haled into Texas. Corinth maintains that the following facts demonstrate its successful avoidance of minimum contacts with Texas in the present transaction: Corinth, a Greek corporation with its offices and factory in Greece, is not registered to do business in Texas or any other location in the United States; it maintains no agent, office, or assets in the United States; IMS and Corinth negotiated the transaction by telegram; the actual sale took place in Greece; IMS opened its letter of credit at a Greek bank in Athens; under the terms of the sale, performance was complete when it delivered the casings to the ocean carrier in Greece, the risk of loss transferring to the plaintiff at that time. Corinth also notes that all of its sales of pipe to United States customers had been on similar terms.

■■■ Although a party can, through its actions, avoid being haled into a foreign jurisdiction, the simple fact that a sales transaction is consummated outside that jurisdiction does not prevent the sale from forming the basis of jurisdiction. *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n. 8 (1980) ("jurisdiction does not depend on the technicalities of when title passes"). Nor is jurisdiction always successfully evaded merely because the defendant has avoided physical contact with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). The "minimum contacts" requirement is satisfied, and "specific" jurisdiction proper,[1] where the contact with the forum arises from the sale or manufacture of a product by a foreign defendant, which has caused harm in the forum state, so long as the defendant delivered the product into the "stream of commerce" with the expectation that it should be purchased by or used by consumers in the forum state. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir.1987) (citing *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

Here, Corinth's expectation that the casings would be used in Texas is indisputa-

---

**1.** Although Gulf contends that both "specific" and "general" jurisdiction exist, our ruling that the requirements of the former are met obviates the need to address the latter.

ble. Corinth had a license agreement with API, an organization in Dallas, Texas, which allowed Corinth to sell API specification pipe. IMS purchased the casing in question in reliance upon Corinth's warranty that the casing was manufactured in accordance with API specifications. Corinth's sole market for API oilfield casing was Houston, Texas, and Corinth representatives frequently called on customers there. Corinth was the charterer of the vessels which carried the casing shipments from Greece to Houston.

■ Corinth contends that the "stream of commerce doctrine" is inapplicable in this case as the nominal plaintiff in the suit did not encounter the product in the stream of commerce. This contention is meritless. The question to be answered in determining whether "minimum contacts" has been satisfied is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. at 566. A defendant's expectation that it may be held into a foreign court does not lessen simply because the ultimate consumer's claim of damages is subrogated to an insurer.

2. Fair and Reasonable

■ The second part of due process analysis asks the question whether it is fair and reasonable to request the non-resident defendant to defend suit in the forum. The determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors, including the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92 (1987).

In *Asahi,* the Court was faced with a situation in which a Taiwanese motorcycle inner tube manufacturer sought indemnity in a California court from its Japanese supplier of valve stems for its settlement of a personal injury claim. In analyzing the burden on the defendant in defending the suit in California, the court stated:

Certainly the burden on the defendant in this case is severe. Asahi has been commanded by the Supreme Court of California not only to traverse the distance between Asahi's headquarters in Japan and the Superior Court of California in and for the County of Solano, but also to submit its dispute with Cheng Shin to a foreign nation's judicial system. The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.

*Id.* at 114, 107 S.Ct. at 1034. Likewise, the burden on Corinth, in having to defend suit in a legal system greatly different from that of Greece, should be given significant weight in our assessment of the reasonableness of Texas's assertion of personal jurisdiction in the present case.

■ The burden on a defendant to have to defend suit in a foreign country may nonetheless be justified if the interests of the plaintiff and the forum are of sufficient importance. *Id.* In *Asahi,* the interests of the plaintiff and the forum were held to be slight for several reasons: the transaction took place in Taiwan; *Asahi's* valve stems were shipped from Japan to Taiwan; the Taiwanese company had not demonstrated that it was more convenient for it to litigate its indemnification claim in California, rather than in Taiwan or Japan. Moreover, because the plaintiff was not a California resident, California's legitimate interests in the dispute were found to have been considerably diminished.

■ Although the transaction in the present case took place in Greece, the defendant sold the pipe in anticipation that it would be shipped to Texas aboard a ship it chartered. Most important, however, Texas has a demonstrable interest in providing a forum for litigation involving an allegedly defective product where the product was intended for use in Texas, where the defect surfaced in Texas, and where the economic injury befell a Texas resident.

*See Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081 (5th Cir.1984). Additionally, it is important to note that Corinth has made 42 sales of tubular goods totalling over $73 million to the Texas market during a seven year period; when viewed in light of this brisk activity, any unfairness to Corinth in having to defend a claim in Texas which arises out of one of those sales is relatively insignificant. The court below did not err in exercising jurisdiction over Corinth.

## B. Choice of Law

Corinth maintains that the district court erred in applying Texas law instead of Greek law, under which the plaintiff's claim would have been time-barred. Although this question is close, we hold that the district court's application of Texas law to have been proper.

> A federal court must follow the choice-of-law rules of the state in which it sits. Texas has adopted the 'most significant relationship' test of the Restatement (Second) of Conflicts section 6 (1971) for determining the applicable law in contracts cases, other than those in which the parties have agreed to a choice of law. The law of the state with 'the most significant relationship to the particular substantive issue' shall govern the dispute.

*Atlantic Mutual Insurance Co. v. Truck Insurance Exchange*, 797 F.2d 1288, 1291 (5th Cir.1986) (citations omitted). The Texas Supreme Court, in applying the "significant relationship" test, looked to the contacts the litigation had with the two forums. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984).

> Once these contacts are established, the question of which state's law will apply is one of law. Moreover, the number of contacts with a particular state is not determinative. Some contacts are more important than others because they implicate state policies underlying the particular substantive issue. Consequently, selection of the applicable law depends on the qualitative nature of the particular contacts.

*Id.*

■ In the present case, the substantive issues of the litigation were whether the warranty made by Corinth that the casings it sold conformed to API standards and whether the failure to comply with those standards was the cause of the plaintiff's loss. Although the sale of the casings took place in Greece, the warranty underlying the lawsuit arose out of a license agreement between Corinth and API, a Dallas-based organization. It is this agreement that allows Corinth to service Texas customers seeking casings meeting API standards. The district court found that this agreement gave Texas a "significant and sufficient" relationship with the warranties made by Corinth, such that Texas law should be applied.

Corinth contends that as the ultimate economic loss incurred as a result of the casing failures fell upon AMI, an Illinois corporation, Texas has lost any interest it may have had in the present lawsuit. We disagree. To say that Texas's interest in this case begins and ends with the economic loss suffered by the nominal plaintiff ignores any general economic, environmental, or public safety interest Texas may have in a failed drilling operation performed within its borders. Moreover, the warranty made in the present case does not represent an isolated occurrence. Between the years 1978 through 1985, as we note above, Corinth made 42 sales of API standard tubular goods, totalling $73 million, to customers in Texas. Texas is Corinth's only market for API standard goods. In these circumstances, Texas could be found to have a substantial interest in ensuring that a manufacturer, whose products are purchased by Texas customers in reliance upon a warranty that they conform to the standards of a Texas organization, not be allowed to escape responsibility for its breach of that warranty through a six-month statute of limitations which expressly disallows a prediscovery tolling period. *See* Greek Civil Code 554, 555.

We acknowledge that Greece has a substantial interest in protecting its citizens from lawsuits it considers time-barred. Nevertheless, we agree with the district court that the Texas contacts with the present litigation are of a sufficiently substantial nature to mandate the use of Texas law in its resolution.

## C. Findings of Fact

Review of factual determinations by the district court is limited by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). This limited review recognizes the unique opportunity of the district court to make credibility choices and resolve conflicts in the evidence. ' "[U]nless an appellate court is left with the 'definite and form conviction that a mistake has been committed,' it must accept the trial court's findings." '

*Ayers v. United States*, 750 F.2d 449, 452 (5th Cir.1985) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982)).

Corinth challenges two of the district court's findings of fact. First, Corinth challenges the district court's finding that the casings which failed in Neely No. 1 were part of the casings shipped aboard the M/V JENNIE S in May of 1981. Second, Corinth challenges the district court's finding that manufacturing defects were the cause of the casing failures.

## 1. The origin of the failed casing

At trial, Gulf introduced documentary evidence demonstrating that the casings off-loaded from the M/V JENNIE S were sent by IMS to Onyx Pipe Threaders for threading and that the 66 joints of casing shipped to Neely No. 1 were taken from IMS's batch of casing at Onyx. Corinth does not dispute that the casing shipped from Onyx to Neely No. 1 was manufactured by Corinth and sold with the warranty that the casing complied with API standards. Corinth contends, however, that the evidence did not foreclose the possibility that IMS may have had unsold casing left over from a previous shipment at the Onyx yard at the time the 66 joints were sold; as the 66 joints may have come from a previous shipment, the statute of limitations for breach of warranty may have run.

At trial, Blaine Curry, the vice president of purchasing for IMS in 1981, testified that, in light of IMS's practices and the market conditions at the time in question, there would have been no inventory kept at the Onyx yard. He could not, however, answer with assurance the question whether the previous shipment of the 8⅝ 24–pound casing to Onyx had been entirely sold out when the 66 joints were shipped.

■ The testimony of Mr. Curry, along with the documentary evidence admitted at trial, is sufficient to support the finding of the district court that the casing shipped to Neely No. 1 was the same casing that was shipped aboard the M/V Jennie S. Although Corinth is correct in its assertion that Gulf has failed to foreclose the possibility that the 66 casings were from a previous sale from Corinth to IMS, upon which the statute of limitation might have run, the burden falls on the defendant to prove that a claim is time-barred. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988). Corinth failed at trial to produce any evidence that the casings in question were from a previous shipment and made no offer of proof as to when any previous shipments took place. As Corinth demonstrated no more than the mere possibility that the action was time-barred, it failed to meet its burden of proof required by this defense.

## 2. The cause of the casualty

Corinth contends the district court's finding that the casing failures were due to manufacturing defects was clearly erroneous or not supported by the evidence. Because the actual casing which failed was subsequently cemented in the well, none of it could be inspected after the events. As a result, no direct evidence was introduced at trial demonstrating that the casualty was caused by the casing's failing to meet API standards.

Evidence produced at trial demonstrated that the seven casing splits occurred only

in the 24–pound casing string; no failures were discovered in the 32–pound casing which was used above and below it. Evidence was also introduced that two unused casings, part of the 66 24–pound casings delivered to the well, had weld seam and occlusion imperfections which rendered them defective by API standards. Gulf introduced expert testimony demonstrating that the defects were present when the casings left the manufacturer and that similar defects were the cause of the downhole failures. Corinth countered this testimony with its own expert who testified that the likely cause of the first casing failure was from mishandling and that the likely cause of the other six failures was from wear on the casing by the drill string during drilling operations.

■ The resolution of the issue of what caused the casing failures required the district court to make a judgment as to the relative credibility of the testimony given by the two experts, evaluated in light of the direct evidence supporting each opinion. Such choices are within the province of the court, when sitting without a jury, subject only to the clearly erroneous standard. *See Ayers v. United States*, 750 F.2d 449, 455 (5th Cir.1985). As the district court's determination to credit the opinion of Gulf's expert cannot be characterized as clearly erroneous, the court's finding that manufacturing defects caused the downhole failures will not be disturbed in this appeal.

### D. Prejudgment Interest

When Mr. Buchanan suffered the loss due to the casing failures, he received reimbursement from United. United, in turn, made claim against Gulf. The loss was ultimately paid by AMI, Gulf's insurer. The court calculated its award of prejudgment interest from the date United paid Mr. Buchanan. Corinth contends that, as AMI did not suffer any loss until it reimbursed United, prejudgment interest should not accrue until the date of that payment. Gulf maintains, however, that the date the cause of action accrued should have been utilized in calculating prejudgment interest.

■ There is no Texas case law dealing explicitly with the issue of prejudgment interest awards to subrogees, but the language used by the Texas Supreme Court in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554–55 (1985), is instructive:

> A plaintiff is not entitled to recover prejudgment interest on damages until those damages have actually been sustained. Until that time, the plaintiff has not lost the use of the money he ultimately receives from the defendant.
>
> Yet a system which would force litigants to determine precisely when each element of a plaintiff's damage award was incurred would impose an onerous burden on both the trial bench and bar.
>
> .    .    .    .    .
>
> A few jurisdictions allow recovery of prejudgment interest as of the date the cause of action accrues. This approach, however, does not preserve the integrity of the principle that prejudgment interest is not meant to punish defendant's misbehavior, but to achieve full compensation for plaintiffs. Rather, it overcompensates the plaintiff by awarding interest on losses not yet incurred.

*Id.* at 554–55. Allowing prejudgment interest only from the time of payment by AMI, the subrogee in this case, effectuates the intent expressed by the court in *Cavnar*, as it will result in a complete recovery for AMI and not overcompensate it. *See also* 83 C.J.S. Subrogation 71 (1953). As the date of AMI's payment to United does not appear in the record before us, it is appropriate for us to remand the prejudgment interest award to the district court to allow for evidence to be taken concerning AMI's date of payment to United and for a recalculation of prejudgment interest from that date.

### III. *Conclusion*

We AFFIRM the judgment of the district court and its award of actual damages, attorneys' fees, expenses and costs to the plaintiff; we VACATE the district court's award of prejudgment interest and REMAND for a hearing on the issue of AMI's

date of payment to United and for a recalculation of the prejudgment interest award.

REAVLEY, Circuit Judge, dissenting:

I am not convinced that Corinth Pipeworks established the type of minimum contacts with Texas that would justify subjecting it to a Texas court's jurisdiction in this contract action. I also believe that, even if Corinth had established minimum contacts with Texas, the exercise of jurisdiction under the circumstances of this case was unreasonable. Because I disagree with the majority's conclusion that the district court's exercise of jurisdiction over Corinth complied with the requirements of the due process clause, I dissent.

## I. Minimum Contacts

A court may premise the exercise of jurisdiction over a nonresident defendant on either a specific or a general jurisdiction analysis. In either case, the "constitutional touchstone" of the due process inquiry is "whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citation omitted). We have explained the object of the minimum contacts analysis in the following terms:

> We must look to see whether there has been some act by which the nonresident " 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws.' The defendant's conduct and connection with the forum state must be such that [it] should reasonably anticipate being haled into court in the forum state."

*Stuart v. Spademan*, 772 F.2d 1185, 1190 (5th Cir.1985) (citations omitted).

A. Specific Jurisdiction

In a specific jurisdiction case, a court should focus its analysis on the relationship between the defendant, the forum, and the litigation. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 1872 & n. 8, 80 L.Ed.2d 404 (1984); *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir.1988).

A court's exercise of jurisdiction is appropriate if "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.*, 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d 528 (citations omitted).

The majority concludes that the district court properly exercised jurisdiction because Corinth delivered its oil well casing into the "stream of commerce" with the expectation that it would be used in Texas. I believe that the majority's reliance on the stream of commerce rationale is inappropriate. The Supreme Court has explained the applicability of that jurisdictional doctrine.

> [I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). As this excerpt suggests and other courts have recognized, the stream of commerce rationale developed as a means for consumers injured by defective products to acquire jurisdiction over the products' manufacturers in products liability actions. *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 298 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Pacific Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1330 n. 1 (9th Cir.1985); *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1124 (7th Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984), 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682

(1984); *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir.), *cert. denied*, 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981). The Supreme Court has concluded that, when a manufacturer has attempted to exploit the market in a state and one of its products has injured a consumer in that state, the manufacturer should foresee that it will be subject to the jurisdiction of that state's courts in a suit by the consumer.

The considerations that justify reliance on the stream of commerce rationale in such circumstances, however, do not justify the exercise of jurisdiction in all cases. *See Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375 (5th Cir.1987); *Max Daetwyler Corp.*, 762 F.2d at 299 & n. 12. Thus, a foreign manufacturer is not required to litigate all disputes in a distant jurisdiction simply because it may be required to litigate some disputes there. This is why the jurisdictional analysis in a specific jurisdiction case must focus on the particular dispute giving rise to the litigation. It is the contacts that relate to the subject matter of the litigation that determine whether the defendant has the minimum contacts with the forum necessary to justify the exercise of jurisdiction.

This litigation arose out of a contract dispute between Gulf Consolidated Services, Inc. and Corinth. Courts have not typically applied the stream of commerce rationale to justify the exercise of jurisdiction in contract disputes. Moreover, the public policy considerations that compel the application of the rationale in products liability cases are not present in breach of contract litigation, where the parties have had some type of direct contact and were able to structure the transaction in light of jurisdictional considerations. The Supreme Court has emphasized that "with respect to interstate contractual obligations, ... parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp.*, 471 U.S. at 473, 105 S.Ct. at 2182, 85 L.Ed.2d 528 (citation omitted). The issue in this case,

therefore, is not whether Corinth placed the oil well casing into the stream of commerce, but whether with respect to the contract of sale Corinth purposefully availed itself of the benefits and protections of Texas law and thus could reasonably anticipate being haled into court in a dispute over that contract. *See Stuart*, 772 F.2d at 1194; *Loumar, Inc. v. Smith*, 698 F.2d 759, 764 (5th Cir.1983).

It is well-settled that "merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir.1986), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1892, 95 L.Ed.2d 499 (1987); *see Burger King Corp.*, 471 U.S. at 478, 105 S.Ct. at 2185, 85 L.Ed.2d 528. Other "factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing— ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479, 105 S.Ct. at 2185, 85 L.Ed.2d 528.

There is absolutely no evidence in the record indicating that Corinth reached out and attempted to establish a contractual relationship with Gulf Consolidated. Corinth is a Greek corporation and has its principal factory and offices in Greece. Corinth is not registered to do business in Texas or in any other location in the United States, and it maintains no agents, offices, or assets in the United States. Gulf Consolidated has presented no evidence that Corinth advertises in Texas or in the United States. Corinth is licensed by the American Petroleum Institute, but at most this indicates Corinth was prepared to sell to purchasers requiring pipe meeting API standards. The licensing agreement in itself is not evidence that Corinth was attempting to exploit the Texas oil well pipe market.

With respect to the particular contract at issue, the record indicates that the center of the contracting process was in Greece. Gulf Consolidated opened negotiations with a telex to the Corinth offices in Athens.

Corinth manufactured the casing in its factory in Greece, and the risk of loss passed to Gulf Consolidated when the casing was loaded onto a ship in Port of Corinth, Greece. Payment was made and the transaction completed when Corinth drew upon a letter of credit previously opened by Gulf Consolidated at the National Bank of Greece in Athens. The only connection Corinth had with Texas was its exchange of telexes with Gulf Consolidated and the shipment of the casing, at Gulf Consolidated's direction, to Texas. These contacts are insufficient to justify the exercise of jurisdiction over Corinth by a Texas court. *See Stuart,* 772 F.2d at 1193; *Loumar, Inc.,* 698 F.2d at 763; *Charia v. Cigarette Racing Team,* 583 F.2d 184, 188–89 (5th Cir.1978).

The majority suggests that Corinth chartered the vessel that delivered the oil well casing to Texas and that this is significant for jurisdictional purposes. The contract between Corinth and Gulf Consolidated required Corinth to pay shipping costs and arrange delivery of the casing. There is testimony in the record that Corinth sometimes chartered[1] vessels to deliver its pipe when the contract required it to arrange delivery. The witness who gave this testimony, however, indicated that he was not involved in this aspect of Corinth's business and that he was not certain about how shipping arrangements were made. Moreover, there was absolutely no testimony about Corinth's arrangements for delivery of the casing that was the subject of the contract involved in this case. Assuming the majority is correct that Corinth chartered the vessel that delivered the casing, this fact has no bearing on the jurisdictional analysis. The evidence in the record indicates that, regardless of the shipping arrangements, Corinth's obligations under the contract were complete and the risk of loss passed to Gulf Consolidated when the casing was loaded onto the vessel in Greece and Corinth received a bill of lading. It thus would appear somewhat misleading to suggest that the mere chartering of a vessel to deliver the casing creates some kind of contact with Texas. Indeed, the cases cited above indicate that the mere shipment of goods to the forum does not justify the exercise of jurisdiction. In this case it is clear that what contact there is resulted not from any purposeful activity of Corinth but rather from the mere fortuity that Gulf Consolidated is a Texas resident and thus specified that the casing should be delivered to Texas. *See Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985).

The contract at issue did not contemplate a long-term relationship with continuing obligations but instead involved an isolated sale of oil well casing. Although it has shown that Corinth knew its products would be shipped to Texas, Gulf Consolidated has not shown that Corinth "reached out" and created contacts with Texas such as would justify an exercise of specific jurisdiction in this contract dispute.

B. General Jurisdiction

In a general jurisdiction case, a court should focus its analysis on the sum total of the defendant's contacts with the forum state to determine whether the defendant has established a general presence in the state. If there are sufficiently "continuous and systematic contacts between the State and the foreign corporation," *Bearry,* 818 F.2d at 374 (emphasis omitted), the foreign corporation may be sued in that state's courts even though a specific jurisdiction analysis would not support a court's exercise of jurisdiction. As discussed above, the issue remains whether the nonresident defendant purposefully established minimum contacts with the forum state, thereby invoking the benefits and protections of the state's laws and making it foreseeable that the party would be haled into court there. *See Stuart,* 772 F.2d at 1191.

Gulf Consolidated notes that between 1978 and 1985 Corinth made forty-two sales of pipe, worth $73 million, to Texas buyers. The record indicates that each of these sales was made on the same terms as

---

**1.** It is not clear from the record exactly how the witness and attorney examining him were using the term "charter." One interpretation of the testimony is that the witness simply meant that Corinth paid a shipping company to deliver the casing to the designated port.

the transaction that is the subject of this dispute. As was noted previously, there is no evidence that Corinth advertised or solicited business in Texas or otherwise reached out to Texas businesses to establish these contractual relationships. Indeed, the evidence suggests that Corinth made efforts to center its activities in Greece and thereby avoid actions that would subject it to the jurisdiction of Texas courts.

The Supreme Court consistently has recognized that the due process analysis "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d 490; *see Burger King Corp.*, 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d 528. In *Bearry v. Beech Aircraft Corp.*, this court relied on those holdings in overturning a Texas federal district court's exercise of jurisdiction over Beech Aircraft, a Delaware corporation with its principal place of business in Kansas. Beech Aircraft had the following contacts, among others, with Texas.

> There was ... evidence that from 1980 to 1985, Beech engaged in a nationwide marketing campaign, employing over 300 marketing employees at its Kansas office. During this five year period, nearly $250 million of Beech manufactured products flowed to seventeen independent Texas dealers from sales carefully negotiated and completed in Kansas.... Beech also manufactured airframe assemblies for Bell Helicopters in Fort Worth, Texas, under contracts exceeding $72 million with all products delivered to Bell "F.O.B. Wichita." Furthermore, Beech representatives visited the Texas dealers on occasion to assist them with maintenance problems, to demonstrate new aircraft, and to offer sales incentives to the Texas dealers, but only at a dealer's request.

> The flow of goods also ran to Beech who purchased over $195 million of goods and services from over 500 Texas vendors under sales agreements with Texas dealers carefully negotiated in Kansas, with delivery of all goods accepted in Kansas.

*Bearry*, 818 F.2d at 372–73. Notwithstanding these relationships with Texas residents, the court concluded that Beech Aircraft was not subject to the general jurisdiction of Texas courts. Specifically, the court held that

> Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them.

> . . . .

> ... [D]istributors selling Beech manufactured products for their own account do not create minimum contacts sufficient to warrant general jurisdiction over Beech. Beech has no office in Texas, has no agents in Texas, and has no control over the Texas dealers. As such, Beech is not "doing business" in Texas.

> In short, that Beech products flow into Texas does not create a general presence in that state. Each transaction was completed outside of Texas. The laws of Texas neither protected nor benefited Beech.

*Id.* at 375–76 (citation omitted). Because Beech Aircraft's actions were not such as would result in the establishment of a general presence within the state, the court's exercise of jurisdiction was improper.

Corinth's contacts with Texas clearly are not as extensive as Beech Aircraft's contacts set forth above. Like Beech Aircraft, Corinth took steps to avoid contact with Texas by centering its activities in Greece. Through its actions, Corinth successfully avoided any appearance either that it was "doing business" in Texas or that it was seeking the benefits and protections of Texas law. Corinth has not established a general presence in Texas, and accordingly,

it is not subject to the general jurisdiction of Texas courts.

## II. Reasonableness

Even if a foreign corporation has established minimum contacts with the forum state, a forum court should refuse to exercise jurisdiction if requiring the corporation to defend in a particular case would not be fair and reasonable. *See Burger King Corp.*, 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d 528. The reasonableness determination will turn on the evaluation of several factors: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interest in the efficient resolution of controversies; and (5) the interests of the several states in furthering fundamental substantive social policies. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92 (1987); *Burger King Corp.*, 471 U.S. at 476–77, 105 S.Ct. at 2184, 85 L.Ed.2d 528.

Although the majority concedes that requiring Corinth to come to Texas to defend this suit involved a substantial burden that should be given "significant weight," it nevertheless concludes that Texas' interest in the litigation made the district court's exercise of jurisdiction reasonable. Specifically, the majority argues that "Texas has a demonstrable interest in providing a forum for litigation involving an allegedly defective product where the product was intended for use in Texas, where the defect surfaced in Texas, and where the economic injury befell a Texas resident." If the majority is suggesting that Texas has an interest in providing a forum because a Texas resident has an interest in the outcome of the litigation, the contention is without support in the record. The real party in interest is American Motorists Insurance Company, an Illinois corporation with its principal place of business in Illinois. All the Texas residents with some connection to the litigation have been made whole. If on the other hand the court is

suggesting that Texas has an interest in providing a forum because maintenance of the suit in Texas will deter Corinth and other manufacturers from selling products that do not meet specified warranties, I would simply suggest that the deterrent factor in itself is an insufficient justification to make the assertion of jurisdiction reasonable. As the Supreme Court noted in *Asahi Metal Industry,* pressure to produce quality goods may be placed on manufacturers by the purchasers of their goods so long as those who ultimately sell the goods are subject to the forum state's tort laws. *See Asahi Metal Indus.*, 480 U.S. at 115, 107 S.Ct. at 1034, 94 L.Ed.2d 92. Texas has little if any interest in providing a forum for this litigation, and any interest it does have would not outweigh the heavy burden on Corinth.

Evaluation of the third and fourth factors does not compel the conclusion that the district court's exercise of jurisdiction was reasonable. Although American Motorists does have an interest in obtaining indemnification, it has not shown that Texas is the only forum in which it could obtain that relief. Moreover, it is not clear why litigating this dispute in Texas is the most convenient forum when the real parties in interest are an Illinois corporation and a Greek corporation. Finally, this is not a situation in which a refusal by the Texas court to exercise jurisdiction would result in piecemeal litigation in multiple forums.

With respect to the fifth factor listed above, the Supreme Court has directed courts to carefully consider the interests of other nations before asserting jurisdiction over a foreign defendant. The Court has stated:

> The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant ..., as well as the Federal interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an un-

willingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."

*Id.* at 115, 107 S.Ct. at 1034–35, 94 L.Ed.2d 92 (quoting *United States v. First Nat'l City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)). Given the heavy burden on Corinth to defend in Texas, Corinth's efforts to structure its relations to avoid the jurisdiction of Texas courts,[2] the minimal interest of Texas in providing a forum for the litigation, and the Supreme Court's direction to exercise caution in subjecting alien defendants to United States courts' jurisdiction, I conclude the district court's exercise of jurisdiction was unreasonable.

Corinth did not have sufficient minimum contacts with Texas to justify an exercise of either specific or general jurisdiction. Even if Corinth did establish minimum contacts, the district court's exercise of jurisdiction was unreasonable under the facts of this case. Because the exercise of jurisdiction was not permissible under the due process clause, the judgment in favor of Gulf Consolidated should be vacated and the cause dismissed.

---

2. The majority suggests that Corinth's "brisk activity" in shipping goods to Texas made the district court's exercise of jurisdiction reasonable. I think it unlikely, however, that connections with a forum that are insufficient to establish minimum contacts would be significant in determining the reasonableness of an exercise of jurisdiction. To the extent Corinth's actions are significant in evaluating reasonableness, I would place greater emphasis on the corporation's efforts to center its activities in Greece than on sales to Texas businesses that sought out the foreign corporation to purchase its goods.