**Francisco NUNEZ, Plaintiff,**

**v.**

**HUNTER FAN COMPANY, d/b/a Hunter Fan of Tennessee, Inc., Defendant.**

**Civil Action No. L–95–44.**

United States District Court, S.D. Texas, Laredo Division.

Feb. 7, 1996.

Guadalupe Castillo, Zaffirini & Castillo, Laredo, TX, for plaintiff.

Alberto Alarcon, Hall Quintanilla & Alarcon, Laredo, TX, Keith A. Warren, Memphis, TN, Thomas H. Lawrence, Memphis, TN, for defendant.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

Pending is Defendant Hunter Fan Company's ("Hunter") Motion to Dismiss and Motion for the Court to Take Judicial Notice of Mexican Law, filed on July 28, 1995. (Docket No. 6). Plaintiff Francisco Nunez ("Nunez") filed a response on August 17, 1995. (Docket No. 11). On September 12, 1995, Hunter filed a reply to Nunez' response. (Docket No. 13). Defendant moves to dismiss under Fed.R.Civ.P. 12(b)(6) on the basis that Mexican law governs this dispute and that under Mexican law, Nunez has failed to state a claim upon which relief can be granted. More specifically, Hunter argues that Mexican law required Nunez to file a grievance regarding his termination of employment with the Mexican Board of Conciliation and Arbitration. (Docket No. 7 at page 6). Further, Hunter asserts that Mexican law requires that claims arising from termination be brought within two months. (Docket No. 7 at page 6). Because Nunez satisfied nei-

ther of these requirements, Hunter concludes that Nunez' claims are barred.

### Factual Background

The facts relevant to the issues before the Court are largely undisputed. Nunez, after several interviews and negotiations with Hunter, agreed to work as a manufacturing manager at Hunter's plant in Monterrey, Mexico. While the parties dispute the terms of the employment contract, and indeed whether there was even a valid contract, it is uncontested that Nunez began working in the Monterrey plant in October of 1994. On November 18, 1994, Nunez was terminated from that position by Jorge Alvarado, Hunter's plant manager in Monterrey. On March 17, 1995, Nunez filed suit in a Webb County, Texas, district court alleging breach of contract; fraud, deceit, and misrepresentation; intentional infliction of emotional distress; and wrongful termination. On May 10, 1995, Hunter timely removed the case to this Court on the basis of diversity of citizenship. (Docket No. 1).

### Legal Analysis

#### 1. Standard of Review

Because both parties have submitted—and the Court has considered—materials outside of the pleadings,[1] Rule 12(b) directs the Court to treat the motion as one for summary judgment and to dispose of it as required under Rule 56. FED.R.CIV.P. 12(b); *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1283–84 (5th Cir.1990).

█ In the instant case, however, Hunter's motion relies entirely upon the premise that Mexican law governs this dispute. Nunez does not contest Hunter's recitation of Mexican law, but instead argues that Texas law, which would not preclude his claims, controls. (Docket No. 11). Because choice-of-law is the dispositive issue, the summary

---

1. In support of the motion, Hunter filed a supporting memorandum accompanied by affidavits, corporate records, and translations of various

Mexican statutes. (Docket No. 7). Nunez presented affidavits and business records identified

judgment standard [2] with regard to disputed facts does not apply. Instead, the facts on which choice-of-law depends are properly determined by the Court after considering the affidavits, depositions, and other matters submitted by the parties. *Vaz Borralho v. Keydril Co.,* 696 F.2d 379, 386–87 (5th Cir. 1983) ("choice of law issues ... were properly determined by the district court"), *overruled on other grounds by In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147 (5th Cir.1987), *vacated on other grounds by Pan Am. World Airways, Inc. v. Lopez,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989). The Fifth Circuit in *Vaz Borralho* explicitly agreed with Judge Weinstein for the proposition that:

> Since the jury will still determine the ultimate facts on the merits, preliminary judicial resolution of the factual issues relevant to the choice of law does not impinge upon the right to jury trial.

*Vaz Borralho,* 696 F.2d at 386 (*quoting Chance v. E.I. du Pont De Nemours & Co., Inc.,* 57 F.R.D. 165, 171 (E.D.N.Y.1972)); *Chance,* 57 F.R.D. at 169 ("circumstance that the facts found for the purpose of ruling on applicable law are intertwined with the ultimate issue on the merits does not require their resolution by the jury"); 1 JACK WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE, § 104[08], at 104–98 n. 8 (1995) ("The authors agree that in most circumstances the judge should determine the facts on which choice of law depends."); *cf. Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir.) (with jurisdictional issues, court "may hear conflicting written and oral evidence and decide for itself the factual issues"), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *but see Orr v. Sasseman,* 239 F.2d 182, 186 (5th Cir.1956) (proper for jury to decide question of where loss of consortium occurred for purposes of applying Georgia or Illinois law).

## 2. Choice-of-Law

█ Under *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), this Court must apply the Texas choice-of-law rules. The Texas Supreme Court has adopted the "most significant relationship" methodology of the *Restatement (Second) of Conflict of Laws* (1971) ("*Restatement*") for tort cases. *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979) (adopting *Restatement* § 6). In 1984, the Court adopted the same analysis for contract disputes. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). The *Duncan* court acknowledged that the "most significant relationship" approach to choice-of-law problems would not apply when "the parties have agreed to a valid choice of law clause" in the contract. *Id.* at 421. In the instant case, however, neither party alleges that such a clause or agreement exists. Thus, *Duncan* and the *Restatement's* "most significant relationship" analysis will govern Nunez' contract claim.

### Contract Claim

In *Duncan,* the Texas Supreme Court recognized the inadequacy of the traditional *lex loci contractus* rule regarding conflict of laws in contract cases, and therefore announced that "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Id.* at 421. This Court must look to "the qualitative nature of the particular contacts" with the forum. *Id.* Once identified, these contacts should be evaluated under the framework of the applicable sections of the *Restatement. Id.* at 420–21 n. 5 (applying § 6 of the *Restatement* ).

As Nunez notes in his August 17, 1995 response (Docket No. 11 at page 4), the *Restatement* offers specific guidelines for contract cases [3]. Important factors include:

---

as Exhibits 1, A, B, C, and D in his response. (Docket No. 11).

**2.** All controversies over factual determinations made in a summary judgment analysis must be resolved in the non-movant's favor. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc* ).

**3.** In light of the written offer of employment (Docket No. 11, exhibit B)—signed by both Nunez and Hunter's Vice President of Operations, James L. Winters—and Nunez' subsequent commencement of work in Monterrey, Hunter's argument that no contract existed appears spurious. For the purposes of the present motion, however,

(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. The contacts are "to be evaluated according to their relative importance with respect to the particular issue." *Restatement* § 188 (adopted by the Texas Supreme Court in *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678–79 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991)).

■ Because the parties do not dispute that the contract was to be performed in Mexico[4], § 196 of the *Restatement*[5] also applies to this case. Section 196 provides:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

When an agreement provides for the performance of personal services in a single forum, that factor generally determines what state's law is to apply, *DeSantis*, 793 S.W.2d at 679, unless an application of § 6 of the *Restatement* reveals that another state has a more significant relationship to the claims. *See Pruitt v. Levi Strauss & Co.*, 932 F.2d 458, 461 (5th Cir.1991) (following the "general rule" of § 196 after determining that no other state had a more significant relationship to the issue under § 6), *abrogated on other grounds by Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 185–86 (5th Cir.1995); *see also Farris v. ITT Cannon, A Div. of ITT Corp.*, 834 F.Supp. 1260, 1267 (D.Colo.1993) (Section 196's "presumption is not conclusive. If another state has a more significant relationship, then that state's law will be applied.") (citation omitted).

The Court must first identify the respective contacts of Mexico and Texas to Nunez' claims. Nunez is a United States citizen residing in Laredo, Texas. Hunter is a Delaware Corporation with its principal place of business in Tennessee. Nunez interviewed for the position of Manufacturing Manager in Hunter's Monterrey, Mexico plant. The interview and pre-employment negotiations took place both in Monterrey and in Laredo, Texas[6].

Hunter formed a Mexican corporation, Hunter Fan Monterrey S.A. de C.V. ("Hunter Monterrey"), apparently to conform with Mexican Labor laws. The parties dispute whether Nunez was employed by Hunter Monterrey or by the U.S. Corporation. Hunter asserts that Nunez "under Mexican law, was an employee of [Hunter Monterrey]," (Docket No. 13 at page 9) while Nunez insists that at all times, he understood that he was working for the U.S. corporation (Docket No. 11, exhibit 1). Nunez was paid in U.S. dollars with deductions made for U.S. federal income tax, social security and unemployment. He never received any benefits under Mexican law nor was he told he was working under Mexican law. Although set

---

the Court need not decide whether a valid contract existed.

**4.** *See* Hunter's Reply, Docket No. 13 at page 4 ("any alleged contract between Plaintiff and Defendant was to be performed wholly outside of Texas and completely in Mexico") and Nunez' Response, Docket No. 11 at page 5 ("The place of employment and the location of the subject matter of the contract ('Manufacturing Manager') is in Monterrey, Mexico.").

**5.** Cited with approval in *DeSantis*, 793 S.W.2d at 679.

**6.** The parties dispute the location where the employment contract was negotiated. Nunez testifies that the contract was formed after negotiations in Monterrey and Laredo, Texas (Docket No. 11, exhibit 1), while Hunter argues that the negotiations took place only in Monterrey and Nuevo Laredo, Mexico (Docket No. 13 at page 9). Hunter's Vice President of Operations, James L. Winters, testified that he met Nunez at the Holiday Inn Civic Center in Laredo and that the "bulk" of the conversations took place in Mexico. (Docket No. 13, exhibit C). The preponderance of evidence, therefore, supports Nunez' claim that at least part of the negotiation occurred in Texas.

up as a separate corporate entity under Mexican law, Hunter Monterrey's articles of incorporation reveal that the company was owned by Hunter's domestic companies[7]. (Docket No. 7, exhibit B, attachment 1 at page 22). The Court finds that, for all practical purposes, Nunez was employed by the domestic corporation. Ultimately, Nunez was terminated on November 18, 1994 by Hunter's plant manager in Monterrey, Jorge Alvarado.

An application of § 6 of the *Restatement* to these contacts determines whether Mexico or Texas law will apply[8]. That section offers the following factors to guide the choice-of-law analysis:

1. The needs of interstate and international systems;
2. The relevant policies of the forum;
3. The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
4. The protection of justified expectations;
5. The basic policies underlying the particular field of law;
6. Certainty, predictability, and uniformity of result; and
7. The ease in the determination of the law to be applied.

*Restatement* § 6.

Under § 6, choice of law hinges not upon the number of contacts but on their quality. *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1075 (5th Cir.) ("Some contacts are more important than others because they implicate state policies underlying the particular substantive issue."), *cert. denied*, 498 U.S. 900, 111 S.Ct. 256, 112 L.Ed.2d 214 (1990); *cf. Restatement* § 145 ("contacts are to be evaluated according to their relative importance with respect to the particular issue").

The Court concludes that the principles listed in § 6 militate in favor of applying Texas law. First, with regard to the needs of the interstate and international system, Hunter makes an elaborate argument for the application of Mexican law based upon a statutory interpretation of supplemental labor agreements to the North American Free Trade Agreement. (Docket No. 13 at pages 5–8). Hunter asserts that a "free trade agreement cannot force social change upon one of its signatory countries" (quoting Comment, *Will NAFTA's North American Agreement Cooperation Improve Enforcement of Mexican Labor Laws?*, 7 Transnational Lawyer 165 (1994)), but that rationale does not fit squarely with the facts of this case. Applying Texas law to a United States citizen's claim against his United States corporate employer does not infringe upon Mexico's sovereignty or in any other significant way dictate to Mexico how to settle its employment disputes.

Hunter also argues that the Supreme Court's holding in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) governs this case. In that case, the Supreme Court held that absent Congressional intent, federal law—and in particular Title VII—would be presumed to have no extraterritorial effect. *Id.* at 248, 111 S.Ct. at 1230–31. From that premise, Hunter concludes that this Court should defer to Mexican law. (Docket No. 13 at pages 7–8). Hunter fails to acknowledge that Nunez, unlike the plaintiff in *Aramco*, is not seeking redress under a federal statute. In fact, the Supreme Court did not address the validity of the *Aramco* plaintiff's state claims, which were dismissed for lack of pendent jurisdiction. *See Boureslan v. Aramco, Arabian American Oil Co.*, 653 F.Supp. 629, 631 (S.D.Tex.1987).

7. Of the 5,000 shares of capital stock issued by Hunter Monterrey, 4,996 were owned by Hunter Fan L.P and the remaining four were owned by Hunter Fan Company.

8. Although thoroughly briefed in Hunter's September 12, 1995 Reply (Docket No. 13), § 6 was never discussed in Nunez' response (Docket No. 11) to Hunter's motion to dismiss. Instead, Nunez relied upon § 188 and the specific factors listed for contract cases. In doing so, Nunez ignores § 196 which provides for application of Mexican law in this case as the contract was to be performed entirely in Mexico. In light of § 196, Texas law will apply only if the principles underlying § 6 so warrant.

Other factors weigh heavily in favor of Texas law. Texas has a more significant relationship to the issue presented than does Mexico. First, Texas has a compelling interest in the application of its employment law to its own residents. *See Pruitt,* 932 F.2d at 461–62 ("[o]ther states ... might have similar interests in the application of their respective employment laws, but these interests are much more attenuated when the aggrieved party is an out-of-state resident"); *see also Albany Insurance Co. v. Anh Thi Kieu,* 927 F.2d 882, 891 (5th Cir.) ("Texas has a strong interest in the protection of its citizens" while other state's "interest in the protection of citizens of foreign states is less significant"), *cert. denied,* 502 U.S. 901, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991).

Second, and perhaps most important, is the fourth factor listed in § 6 of the *Restatement:* protection of justified expectations. Hunter asserts that Nunez had "no 'justified' expectation that Texas law would apply in this case." (Docket No. 13 at page 9). Hunter reaches this conclusion primarily from the fact that the place of performance under the contract was Monterrey, Mexico[9], but this argument overlooks the express language of § 196, which contemplates situations in which the principles enunciated in § 6 would justify the application of another state's law.

The facts of this case would give Nunez a justifiable expectation that United States law should apply. Hunter, a United States corporation, recruited Nunez, a United States citizen, to work in its Monterrey operations. Nunez was compensated in United States currency deposited in a United States bank account[10] and he was subjected to both United States federal income tax and social security taxes. Nunez negotiated and interviewed for the job at least partly in the United States. Hunter's job offer letter of October 4, 1994, was sent from Tennessee to Nunez in Laredo, Texas and signed there. In light of these circumstances, Nunez certainly could have reasonably and justifiably expected to be governed by Texas and not Mexican Law. As the remaining factors listed in § 6 do not weigh greatly in favor of Texas or Mexico, the Court finds that Texas law will govern Nunez' contract claim. Under the principles of § 6, Texas has the most significant relationship to the present dispute.

### Tort Claims

■ For tort cases, as with contract disputes, Texas courts rely upon the *Restatement's* most significant relationship methodology. *Gutierrez,* 583 S.W.2d at 318. The Court recognizes that § 145 provides specific guidance for tort cases[11], but in this case, the alleged torts are clearly derivative of, and completely interrelated with, the breach-of-contract claim. Thus, the same § 6 analysis for Nunez' contract claim will govern his tort claims and Texas law will apply.

Accordingly, Defendant Hunter Fan Company's Motion to Dismiss and Motion for the Court to Take Judicial Notice of Mexican Law (Docket No. 6) is DENIED.

### 3. Mediation

The parties agreed to have this case referred to mediation in their joint Report on

---

9. Hunter also asserts that the contract was negotiated in Mexico and that Nunez was employed by Hunter Monterrey. As previously discussed, the more credible evidence shows that negotiations took place at least partly in Mexico and Texas and that Nunez' employer, for all practical purposes, was Hunter's domestic corporation.

10. Nunez' payment arrangement was conceded by Hunter's Vice President of Operations, James L. Winters, in his affidavit testimony. (Docket No. 13, exhibit C at page 2).

11. *See Restatement* § 145, providing:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Possible Alternate Dispute Resolution, filed October 6, 1995 (Docket No. 14), but requested that mediation be delayed pending the Court's ruling on Hunter's motion.

The parties have expressed the desire that Magistrate Judge Notzon conduct the mediation. The Court has no objection, so long as the mediation is concluded by March 1, 1996. If for any reason Judge Notzon declines, or if the parties have changed their minds, the Court should be notified immediately so that another mediator can be designated.